**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**CYNTHIA HOEFT,**

$\qquad\qquad$ **Plaintiff,**

$\qquad$ **v.**

**UNITED STATES OF AMERICA,**

$\qquad\qquad$ **Defendant.**

---

**Civil Action No. 16-0171 (TFH)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Cynthia Hoeft filed this lawsuit against the United States of America after a motorist struck and injured her while she was riding her bicycle across a crosswalk in the District of Columbia during rush hour. The plaintiff contends that the collision occurred because the United States—namely the National Park Service—negligently failed to place adequate signs along the roadway warning motorists about the crosswalk. The undisputed facts reveal, however, that motorists had an unobstructed view of the crosswalk as they approached it, there were two signs alerting motorists about the crosswalk and, regardless, the motorist who struck the plaintiff was already aware of the crosswalk because he had spent nearly five years driving to and from work via the road where the crosswalk was located.

Pending before the Court are both parties' motions for summary judgment. Because the plaintiff failed to supply the expert testimony that is necessary to establish the duty of care she contends the United States owed her and breached, and she also failed to show that the lack of additional road signs proximately caused the collision, she cannot establish that the United States is liable for her injuries as a matter of law. Accordingly, the Court will deny the plaintiff's motion and grant the United States' motion.

## BACKGROUND

At 8:47 a.m. on April 25, 2013, motorist Blake Alberger struck the plaintiff as she rode her bike across a crosswalk that is located on Columbia Island near Memorial Circle.  Def.'s Mot. Attach. 4, Motor Vehicle Traffic Accident Report at 1–2 [ECF No. 31-10].  Columbia Island is an island on the Potomac River that borders Virginia but is in the District of Columbia's boundary.  *See id.* Attach 11, Nadas Decl. ¶ 2 [ECF No. 31-11].  The following satellite image shows the location of the crosswalk, which is on South Arlington Boulevard, north and west of Arlington Memorial Bridge.  It is identified in the parties' legal briefs as "Crosswalk #1."



Most of the collision's circumstances remain somewhat of a mystery.  An accident report prepared by United States Park Police Officer Donald Greene provides scant information about the collision beyond the date, time, vehicle involved, bike involved, and a description that erroneously states that "[b]icycle 1 was traveling westbound[1] on the bike path north of Memorial Circle and entered the crosswalk.  Vehicle 2 was in the right lane northbound [George Washington Memorial Parkway] north of Memorial Circle crashed into bicycle 1 [sic]."  Def.'s Mot. Attach. 10, Wallace Decl. Ex. F, Motor Vehicle Traffic Accident Report at 1–2 [ECF No. 31-10].  Although Officer Greene cited motorist Blake Alberger for "fail[ure] to give full time & attention," *id.* at 2, this appears to have been a default citation that was based solely on "the fact that the car collided with a bicyclist in the crosswalk," which Officer Greene affirmed "meant that the driver would be cited in that scenario," *id.* Attach. 8, Greene Dep. 24:5–22 [ECF No. 31-8].  Officer Greene conceded that the citation did not reflect "the specific circumstances that preceded the accident."  Greene Dep. 24:9–13.

The plaintiff, motorist Blake Alberger, and the accident witnesses—Pamela Shirley Ellsworth, Alvin M. Townley, and Dennis Bertsch—were not deposed until a half-decade or more after the collision occurred.  *See* Def.'s Mot. Attach. 2, Hoeft Dep., Aug. 22, 2018 [ECF No. 31-2], Attach. 3, Ellsworth Dep., May 15, 2019 [ECF No. 31-3], Attach. 4, Alberger Dep., July 17, 2018 [ECF No. 31-4], Attach. 6, Townley Dep., May 2, 2019 [ECF No. 31-6], Attach. 7, Bertsch Dep., May 2, 2019 [ECF No. 31-7].  As a result, aside from Officer Greene's accident

---

[1] The parties appear to agree that the plaintiff was actually traveling eastbound (west to east) toward the Potomac River.  *See, e.g.*, Def.'s Mot. Attach. 10, Wallace Decl. Ex. A, Report for McCarthy, Winkelman & Mester, L.L.P. at 3 [ECF No. 31-10] (stating that "we realized the crash report states that Ms. Hoeft was riding Westbound when in fact, she was riding Eastbound at the time of the crash"); Def.'s Mem. of P. & A. in Support of Mot. for Summ. J. 2 [ECF No. 31] (hereinafter cited as "Def.'s Br.").  Accordingly, discussions about the motorist's or witnesses' views to the "left" refer to their views to the west given that Crosswalk #1 runs west to east across South Arlington Boulevard and that is the direction the plaintiff was traveling.

report, the record contains no contemporaneous account of the collision.  And the plaintiff's, motorist's, and witnesses' memories of the collision vary and sometimes conflict.

The plaintiff, who alleges that she was seriously injured by the collision,[2] does not recall the minutes before it occurred, what she did as she approached the crosswalk, whether she rode her bike or walked across the crosswalk, or even what her last memory was before she was hit. *Id.* Attach. 2, Hoeft Dep. 16:23–17:14, 28:16–17:14.  Indeed, she stated during a deposition that she has no recollection of what happened.  Hoeft Dep. 17:9–11.  Although she said that it was her practice to stop at the edge of the road before entering the crosswalk, make eye contact with vehicle drivers who stopped, and then ride her bike across the crosswalk, she admitted that she had no specific recollection of whether she did those things on the day of the accident.  Hoeft Dep. at 17:15–23.  She did, however, consider herself an experienced bicyclist who rode the same route to work for several years.  Hoeft Dep. 12:16–18, 13:3–5.  And she believed, based on her typical biking habits, that she was probably riding her bike across the crosswalk when the collision occurred given that she usually did not dismount before crossing, notwithstanding that she knew there was a sign instructing her to do so.  Hoeft Dep. 12:16–18, 13:3–22, 14:18–15:3, 15:9–24, 26:7–22; *see also* Def.'s Mot. Attach 5, Tyree Dep. 82:1–5, May 15, 2019 [ECF No. 31-5] (confirming that there was a stop sign for bicyclists and pedestrians as well as a separate sign directing bicyclists to dismount before crossing at Crosswalk #1).

Motorist Blake Alberger stated that he was driving his vehicle out of the District toward Virginia—west and north across Arlington Memorial Bridge—when he approached Crosswalk #1 in South Arlington Boulevard's right lane. *Id.* Attach. 4, Alberger Dep. 17:24–18:3 [ECF No.

---

[2] The plaintiff testified during her deposition that she suffered the following injuries as a result of the accident:  an injured knee, double vision issues, a punctured lung, a punctured right ankle, and a concussion.  *Id.* Attach. 2, Hoeft Dep. 28:16–29:14.  She also testified that all of the injuries resolved without surgery within three to four months after the accident.  *Id.* at 29:12–25.

31-4].  He came to a complete stop "[p]robably about a foot" from Crosswalk #1 to let a bicyclist pass who was not the plaintiff.  Pl.'s Mot. Attach. 3, Alberger Dep. 32:1–19, July 17, 2018 [ECF No. 32-1].  He said that an SUV stopped in the lane to his immediate left and blocked his view westward, Alberger Dep. 20:3–7, 32:20–33:3, which was the direction the plaintiff was coming from, Alberger Dep. 19:12–13.  After he saw the first bicyclist pass there was nothing in front of him and the road was clear, so he advanced into the crosswalk, at which point he saw the plaintiff hit the front of his vehicle and windshield, roll over the vehicle, and land behind it.  Alberger Dep. 19:4–24, 20:14–22, 33:8–11.

Witness Pamela Shirley Ellsworth was in the fourth vehicle of a line of vehicles that stopped in the center lane at Crosswalk #1 while the plaintiff was crossing.  Def.'s Mot. Attach. 3, Ellsworth Dep. 9:21–10:16 [ECF No. 31-3].  She said the left lane of traffic had also stopped. Ellsworth Dep. 11:10–18.  She did not see the collision, but she believed that the motorist involved in it passed her in the right lane where no vehicles were stopped.  Ellsworth Dep. 11:19–21, 14:4–12.  She could only see the plaintiff from the shoulders up so she could not see whether the plaintiff was riding a bike, Pl.'s Mot. Attach. 1, Ellsworth Dep. 28:1–13 [ECF No. 32-1], but she watched the plaintiff "the whole time" and never saw the plaintiff turn her head to check for traffic in the right (third) lane while crossing Crosswalk #1, Def.'s Mot. Attach. 3, Ellsworth Dep. 22:5–9.  She did not recall seeing any crosswalk warning signs as she approached Crosswalk #1 from the Memorial Bridge.  Pl.'s Mot. Attach. 1, Ellsworth Dep. 28:19–29:7.

By the time witness Alvin M. Townley was deposed six years after the collision, he commented that it had "been a long time" and he "just [didn't] know that [he] was paying that much attention."  Def.'s Mot. Attach. 6, Townley Dep. 12:8–10 [ECF No. 31-6].  Indeed, he thought he remembered seeing the plaintiff get hit by a cab or minivan, Townley Dep. 12:10–13,

whereas the contemporaneous accident report reflects that the motorist who hit the plaintiff was driving a Volkswagen Jetta, Def.'s Mot. Attach. 10, Wallace Decl. Ex. F, Motor Vehicle Traffic Accident Report at 1 [ECF No. 31-10].  Townley could not recall whether other cars were stopped at Crosswalk #1 before the collision.  Pl.'s Mot. Attach. 2, Townley Dep. 23:3–9, 24:8–10 [ECF 32-1] ("I just don't remember seeing any stopped cars . . . one way or the other.").  And he didn't recall seeing the plaintiff until "maybe a couple of moments before the impact occurred," which he thought happened in the center or left lane rather than the right lane.  Townley Dep. 24:3–22.  With respect to crosswalk-warning signs, he thought there might have been "a post on the . . . river side" where the witnesses gathered after the accident, Townley Dep. 34:2–10, but he could not recall any seeing any lights or rumble strips, Townley Dep. 34:11–35:8.

Like Pamela Ellsworth, witness Dennis Bertsch was in the center lane when the collision occurred.  Def.'s Mot. Attach. 7, Bertsch Dep. 9:1–8 [ECF No. 31-7].  He said that "all traffic was moving" at the time of the collision, Bertsch Dep. 11:25–12:10, although he recalled that some traffic had begun to slow down, Bertsch Dep. 11:22–24, 14:24, which he thought was the catalyst for the accident, Bertsch Dep. 12:3–10.  He explained that, as he "came off the [Arlington Memorial] bridge and turned right, traffic started to slow down a little, and as it slowed down, the—not the car ahead me, but the car in—ahead of that car swerved to the right quickly and hit a bicyclist."  Bertsch Dep. 9:8–12.  Although he said the collision appeared to have happened at the crosswalk, he commented that he "wasn't looking at the crosswalk as [he] was driving."  Bertsch Dep. 9:16–20.  As a result, he was not sure whether the plaintiff was on a bike when the collision happened because he did not see the plaintiff until the moment of impact.  Bertsch Dep. 9:21–10:8 (stating that he "was looking at the cars ahead of [him]" until he saw a

car swerve to the right and then his "eyes came in contact with the person and [he] saw a person
and a bicycle" and "it was just—when [he] saw them, the accident occurred . . . [s]o it wasn't
that [he] saw them before it occurred"). He "guessed," however, that the plaintiff was not riding
a bike because his "vision would have had [her] higher in the—in the picture, if [she was] sitting
on a seat." Bertsch Dep. 10:12–18. He based this guess on the fact that it seemed to him that the
plaintiff was "lower" and "appeared to be just barely above the car that hit [her]." Bertsch Dep.
10:17–11:2. Meanwhile, he conceded that, before his deposition, he previously told government
counsel that he thought the plaintiff *was* on a bicycle. Bertsch Dep. 19:6–20:10. He did not
know the kind of car that hit the plaintiff or where the plaintiff was coming from, although he
thought the plaintiff was coming westbound from the right. Bertsch Dep. 13:3–6, 19:2–5.

      Importantly, there is no dispute that at least some of the traffic had slowed or come to a
complete stop when the plaintiff began to cross Crosswalk #1. The motorist, witness Pamela
Shirley Ellsworth, and witness Dennis Bertsch all stated as much. Def.'s Mot. Attach. 4,
Alberger Dep. 18:18–20 (affirming that he stopped at Crosswalk #1 to allow a different bicyclist
to pass) [ECF No. 31-4], Attach. 3, Ellsworth Dep. 10:10–12 [ECF NO. 31-3] (stating that "all
the cars were stopped" in "[t]he first two lanes" as the plaintiff began to cross Crosswalk #1),
Attach 7, Bertsch Dep. 11:22-24 [ECF No. 31-7] (affirming that immediately before the collision
"traffic had slowed"). And neither the plaintiff's nor witness Alvin Townley's testimony creates
an issue of material fact on this point because neither can remember one way or the other
whether traffic generally—or specifically the motorist who hit the plaintiff—had stopped or
slowed before the collision. *Id.* Attach. 2, Hoeft Dep. 16:1–17:23 [ECF No. 31-2] (stating that
she has no recollection of what happened before or during the collision), Attach. 6, Townley
Dep. 22:14–24 [ECF No. 31-6] (stating that it is equally plausible that the motorist stopped or

never stopped and he could not "definitely rule out either of those" possibilities because he simply did not remember), Townley Dep. 23:3–9 (stating that "I just don't remember other traffic" and "[w]hether that was because I just don't remember or whether there wasn't other traffic there . . . I just don't—I don't recall that").

Another important undisputed fact is that Blake Alberger, the motorist involved in the collision, was familiar with the roadway where the collision occurred because he commuted to work along that route daily for about five years from 2006 through 2011. Def.'s Mot. Attach. 4, Alberger Dep. 17:7–23 [ECF No. 31-4]. Notably, he confirmed that he was also familiar with the crosswalks there. Alberger Dep. 17:21–23.

In addition, the plaintiff's expert witness, Walter Preston Tyree, III, conceded that, at the time of the collision, motorists had an unobstructed view of the crosswalk as they approached it, and Alberger, if he was paying attention, could have seen both a pedestrian crossing sign at Crosswalk #1 and that there were "cars ahead of him already stopped at the crosswalk." Def.'s Mot. Attach 5, Tyree Dep. 103:9–104:3, 119:2–25 [ECF No. 31-5]. Moreover, there is no dispute that there were actually two pedestrian warning signs on each side of the roadway at Crosswalk #1 when the collision occurred. Compl. ¶ 9 [ECF No. 1]; Def.'s Br. at 5 [ECF No. 31].

The plaintiff filed this lawsuit on February 2, 2016, and invokes the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, to recover damages for the personal injuries she suffered from the collision. She claims that she "would not have been struck and injured" if the United States had "properly placed and maintained signage on the roadway and/or crosswalk." Compl. ¶ 24. She therefore seeks to recover damages in the amount of $5 million for mental and

physical injuries, past and future medical costs, past and future lost wages, and related expenses she incurred as a result of the injuries.  Compl. ¶ 24 & p.6 (demand).

Both parties now move for summary judgment.[3]  The Court entertained oral arguments on November 15, 2019 but directed the parties to submit supplemental briefs addressing the import of the D.C. Court of Appeals decision in *District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C. 1984).  Those supplemental briefs have now been filed and the motions are ripe for a decision.

## LEGAL STANDARDS

### I.      Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that the Court grant summary judgment in favor of a moving party when there are no genuine disputes about material facts and judgment as a matter of law is warranted.  Fed. R. Civ. P. 56(a).  A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing that there are no genuine disputes about material facts.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  To determine whether that burden has been met, the Court must view the evidence in the light that is most favorable to the party opposing the motion and draw all reasonable inferences in the opposing party's favor.  *Tolan v. Cotton*, 572 U.S. 650, 656, 651 (2014) (per curiam).  The Court may not weigh the evidence or make credibility determinations when assessing whether genuine disputes about material facts exist.  *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015).

---

[3] The plaintiff characterizes her motion as one for partial summary judgment because she sought judgment only on the question of liability.  Pl.'s Mot. at 1 [ECF No. 32].

To successfully overcome a motion for summary judgment, the opposing party must offer sufficient evidence of a factual dispute—not mere allegations—such that a jury or judge is necessary "to resolve the parties' differing versions of the truth at trial." *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). Although that evidence need not be "in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969 (D.C. Cir. 2016) (emphasis in original) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphases in original).

Of course, as Rule 56 makes clear, even if the material facts are undisputed, the law applied to those facts must also support granting summary judgment in the moving party's favor. *See* Fed. R. Civ. P. 56(a) (stating that, in addition to showing that there are no genuine disputes of material facts, the moving party must also show that he or she is entitled to judgment as a matter of law).

## II.     The Federal Tort Claims Act

Because the plaintiff is suing the United States, she must overcome sovereign immunity. As a general rule, "sovereign immunity shields the Federal Government and its agencies from suit" unless that immunity has been waived. *F.D.I.C. v. Meyer,* 510 U.S. 471, 475 (1994). As already indicated, the plaintiff invokes the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq*., which serves as a statutory waiver that was "designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render

the Government liable in tort as a private individual would be under like circumstances."

*Richards v. United States*, 369 U.S. 1, 6 (1962).

This Court's jurisdiction for claims advanced under the Federal Tort Claims Act is set forth in 28 U.S.C. § 1346(b).  Section 1346(b) states that district courts have exclusive jurisdiction over civil actions for money-damages claims against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The Supreme Court has "made clear that [section] 1346(b)'s reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA."  *Tri-State Hosp. Supply Corp.*, 341 at 571.  "Thus . . . state law establishes the elements of a particular tort that is otherwise actionable under the FTCA."  *Id.* at 576.  There is no dispute in this case that District of Columbia law establishes the elements of the negligence tort that the plaintiff pursues under the Federal Tort Claims Act.

## ANALYSIS

The plaintiff moves for partial summary judgment on the issue of liability.  She asserts that summary judgment in her favor is warranted because the National Park Service negligently breached "a duty to place adequate warning signs along the roadway to alert motorists of bicyclists in Crosswalk #1" and this negligence "caused or contributed to" the collision that injured her.  Pl.'s Mem. of P. & A. in Support of Pl.'s Mot. 2 [ECF No. 32] (hereinafter cited as "Pl.'s Br.").

The United States also moves for summary judgment.  It challenges the plaintiff's theory of liability and argues that summary judgment should be granted in its favor on the grounds that (1) the plaintiff's own negligence in failing to comply with a dismount-before-crossing sign contributed to the cause of the collision, (2) she failed to tender competent expert testimony to establish that the National Park Service breached a duty of care, and (3) she failed to show that any defect in the roadway signage leading to Crosswalk #1 proximately caused the collision. Def.'s Br. at 1 [ECF No. 31].

## I.    Duty of Care

In the District of Columbia, a plaintiff can succeed on a negligence claim if she can "show that the defendant owed [her] a duty of care, that the defendant breached the duty, and that [she] suffered damages as a result." *Papageorge v. Zucker*, 169 A.3d 861, 863 (D.C. 2017). It is the plaintiff's burden to establish the applicable standard of care. *Young v. D.C.*, 752 A.2d 138, 145 (D.C. 2000); *accord Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009).

Historically, expert testimony was not required to establish the standard of care in a negligence case unless it "concern[ed] a subject so related to some profession or occupation as to be beyond the realm of knowledge of an average lay person." *Young*, 752 A.2d at 145.  Over time, however, "the D.C. Court of Appeals has required expert testimony in a wider variety of cases . . . even in those that might initially seem to fall within jurors' common knowledge." *Godfrey*, 559 F.3d at 572.  Now, under District law, expert testimony is required unless "everyday experience makes it clear that jurors could not reasonably disagree over the care required." *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007).

For cases like this one that "involve issues of safety," expert testimony is "routinely required."  *Id.* at 845–46 (internal quotation marks omitted).  More specifically, the D.C. Court

of Appeals held in *District of Columbia v. Freeman* that expert testimony is required when a plaintiff alleges that a government had a duty to increase pedestrian safety at a crosswalk and was negligent by failing to do so.  477 A.2d at 719.

      *Freeman* involved a motorist who struck a pedestrian in a crosswalk under circumstances that are remarkably similar to, albeit even more egregious than, this case.  In *Freeman*, a car stopped in the left lane of a multi-lane road to allow a child to cross a crosswalk but another motorist pulled into the right lane and hit the child.  *Id.* at 714–15.  Although there had been an advance crosswalk-warning sign at one time, it "had been down for over a year" when the collision occurred.  *Id.* at 714.  Thus, unlike the instant case, which involves a crosswalk that had advance warning signs on both sides of the roadway, the crosswalk in *Freeman* had no such signs.  One of the plaintiffs' theories of liability in *Freeman* was that "the District's negligent failure to increase pedestrian protection at the intersection left the area unduly dangerous, and that this 'defect' proximately caused [the child's] injuries."  *Id.* at 717.

      Addressing the plaintiffs' burden to establish that a duty of care was breached, the D.C. Court of Appeals explained in *Freeman* that the plaintiffs were first required to establish the scope of the defendant's duty, which in that case meant establishing what was sufficient to "render a particular intersection reasonably safe."  *Id.* at 719. As the court noted, the plaintiffs "shouldered the . . . burden of proving that the crosswalk—a traffic control device—was insufficient to protect pedestrians to the extent that the intersection could be characterized as unduly hazardous or defective."  *Id.* at 718.  "For only upon such a showing could it be said . . . that the District had shirked its responsibility . . . to maintain its streets in reasonably safe condition."  *Id.*  In other words, the plaintiffs needed to first prove that the District's duty to make the roadway reasonably safe required it to do something more than simply place a painted

-13-

crosswalk at an intersection because that proof would set the benchmark for determining whether the District had breached its duty.  Without proof about what the District was obligated to do to make the intersection safe, it would not be possible to establish that the District had committed a breach by failing to do them.

Turning to the question of what the District was obligated to do to make the intersection at issue in *Freeman* safe, the D.C. Court of Appeals found that "whether a painted crosswalk is sufficient to render a particular intersection reasonably safe is a determination essentially technical in nature, based upon an expert evaluation of vehicular and pedestrian traffic patterns, design feasibility, cost effectiveness, and related variables." *Id.*  The court went on to observe that expert testimony was also necessary to place evidence in the form of aerial photographs, diagrams, and the intersection's dimensions "in an appropriate context for the jury." *Id.*  As a result, the D.C. Court of Appeals found it "fatal" to the plaintiffs' case that they failed to submit "expert testimony from traffic engineers, designers, or highway safety experts" to prove that "the crosswalk—a traffic control device—was insufficient to protect pedestrians to the extent that the intersection could be characterized as unduly hazardous or defective." *Id.* at 718, 719.

The plaintiff here advances the same fundamental theory of liability that the plaintiffs in *Freeman* pursued, which is that Crosswalk #1 was insufficient—even with two advance signs alerting motorists of its presence—to make the roadway safe for bicyclists and pedestrians to cross.  She frames this theory in terms of the United States having a "duty to place adequate warning signs along the roadway to alert motorists of bicyclists in Crosswalk #1."  Pl.'s Br. 2.  The decision in *Freeman* dictates that, because the question of "whether a painted crosswalk is sufficient to render a particular intersection reasonably safe is a determination essentially technical in nature," the plaintiff must present expert testimony based on an "evaluation of

vehicular and pedestrian traffic patterns, design feasibility, cost effectiveness, and related variables" to establish the government's duty and put the evidence in an appropriate context. 477 A.2d at 719.  The plaintiff failed to do this.

The plaintiff presented Walter Preston Tyree, III, as her only expert witness.  *See* Pl.'s Br. 10 (identifying Tyree as the plaintiff's "expert"); Pl.'s Opp'n to Def.'s Mot. 15 [ECF No. 33] (hereinafter cited as "Pl.'s Opp'n Br.").  But Tyree stated that the scope of his expertise in this case was limited to bicyclist safety issues, traffic safety education, and bicyclist behavior.  *See* Def.'s Mot. Attach. 5, Tyree Dep. 23:20–24:9, May 15, 2019 [ECF No. 31-5]; Pl.'s Opp'n Br. 16 (stating that Tyree testified during his deposition "based on his expertise in bicycle safety").  He conceded that he had no educational background or training in traffic safety and roadway design, civil engineering, traffic engineering, safety engineering, or city planning.  *Id.* at 21:16–22:8. According to his expert report and testimony, his expert opinion was confined to stating that:

> It is more likely than not that the lack of advanced warning signs and the configuration of Memorial Circle and the non-standard operation of the traffic in the circle contributed to the crash.  The recommendations in the [2011 Pedestrian Road Safety Audit] were appropriate and if they had been followed the crash either could have been avoided or the injuries to [the plaintiff] would have been significantly reduced through reduced speeds.

*See* Def.'s Mot. Attach. 5, Tyree Dep. 71:1–72:5, 133:24–135:3, Attach. 10, Wallace Decl. Ex. A, Report for McCarthy, Winkelman & Mester, L.L.P. at 2 [ECF No. 31-10].

Tyree relied almost exclusively on the 2011 Pedestrian Road Safety Audit (RSA) that the National Park Service commissioned from the Federal Highway Administration as the basis for his expert opinion that additional signs were needed in advance of Crosswalk #1.  But he made no independent evaluation of vehicular and pedestrian traffic patterns, design feasibility, cost effectiveness, or related variables to support this opinion or his opinion that the collision could have been avoided if the 2011 Pedestrian Road Safety Audit recommendations were

implemented.  Instead, he spent about an hour conducting a site visit at the location of Crosswalk #1 on a Sunday morning in March 2018 at 8:45 a.m., which was about five years after the collision occurred and was at a time and under circumstances that he conceded "would not really correspond to what the situation likely was the morning of the incident."  *Id.* at 37:11–17, 75:22–76:10, 77:11–13.

Although he stated that he traversed Crosswalk #1 with a bike to "gather[] data" about "how long it would take to walk [his] bicycle across the crosswalk" and "[h]ow the cars approach or not," *id.* at 37:11–17, he admitted that he did not take any measurements of the time his walk took or the behavior of cars approaching Crosswalk #1 while he was crossing, *id.* at 38:20–39:21.  He also did not measure the distance from Arlington Memorial Bridge to Crosswalk #1 "or anything like that," although he did say that he calculated the distance "based on aerial photographs of the site."  *Id.* at 78:17–25.  He conceded, though, that this calculation was not in his expert report and he could not recall it when asked about it during his deposition. *Id.* at 79:2–20.  He also did not measure the speed of vehicles on Arlington Memorial Bridge, the speed of vehicles as they left the bridge and advanced toward Crosswalk #1, and he could not recall the number of vehicles that traveled over Crosswalk #1 while he observed traffic during the site visit.  *Id.* at 85:20–23, 88:9–24.

Aside from this one-hour site visit, the only other thing Tyree did to prepare his report was spend six to eight hours reviewing various documents.  *Id.* Attach. 10, Wallace Decl. Ex. A, Report for McCarthy, Wilkelman & Meester, L.L.P. at 3–4 [ECF No. 31-10].  Those documents included the 2011 Pedestrian Road Safety Audit, the Federal Highway Administration's Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD), and an American

Association of State Highway and Transportation Officials (AASHTO) publication titled "Guide for the Development of Bicycle Facilities." *Id.* at 3–4.

Tyree's expert report can be fairly described as simply adopting and parroting the recommendations made in the 2011 Pedestrian Road Safety Audit. *See id.* at 4–7, 10. As already discussed, he essentially conceded that he conducted no meaningful independent evaluation of the vehicular and pedestrian traffic patterns as they would have existed when the collision occurred, and he offered no expert assessment of the design feasibility, cost effectiveness, or other such related "technical" variables that the D.C. Court of Appeals views to be necessary to establish the government's duty to maintain a reasonably safe road and crossing for bicyclists and pedestrians.

To the extent that his testimony and report are merely serving as proxies for the 2011 Pedestrian Road Safety Audit,[4] he failed to identify any basis to conclude that the National Park Service had a duty to implement that audit's recommendations, particularly when, as the United States correctly noted, the agency that conducted the audit expressly stated that it was "[n]ot a safety study" and disavowed its use to replace "[d]esign quality control or standard compliance checks also known as 'safety reviews of design,'" "[t]raffic impact or safety impact studies," "[s]afety conscious planning," "[r]oad safety inventory programs," and "[t]raffic safety modeling efforts," Def.'s Mot. Attach. 9, Fed. Highway Admin., FHWA Road Safety Audit Guidelines, *available at* https://safety. fhwa.dot. gov/rsa/ guidelines/chapter1.cfm. Nor did Tyree independently verify that the audit's recommendations were, in fact, appropriate and technically

---

[4] The plaintiff states in her supplemental brief that the 2011 Road Safety Audit is the "expert analysis" that she concedes the decision in *Freeman* requires her to present. Pl.'s Supplement 2–4 [ECF No. 36]. But she overlooks the need for an expert witness's testimony to put the audit in context, *see Freeman*, 477 A.2d at 719, and she failed to identify any of the audit's authors—or anyone for that matter—who would testify about the audit's recommendations or otherwise properly explain to a jury the duty of care the United States owed the plaintiff.

required to make Crosswalk #1 safe for the purpose of establishing the scope of the National

Park Service's duty of care.[5]  He never even independently stated—based on his own expertise,

experience, and evaluation—precisely what is required to make a crosswalk reasonably safe for a

roadway that has the conditions and characteristics of the one that Crosswalk #1 intersects.

Although some of the deficits in Tyree's report and testimony overlap with questions of

qualification, reliability, and credibility that are not presently at issue, the upshot is that he was

the only expert the plaintiff proffered and he failed to identify the applicable duty of care or what

the National Park Service had to do with respect to Crosswalk #1 to satisfy that duty of care.

The plaintiff offered no other expert to fill that void.  *See supra* note 4.

As the D.C. Court of Appeals made clear in *Freeman*, this is a fatal flaw in the plaintiff's

case because "whether a painted crosswalk is sufficient to render a particular intersection

reasonably safe is a determination essentially technical in nature" and beyond the ken of the

average layman.  477 A.2d at 719.  It must be "based on an expert evaluation of vehicular and

pedestrian traffic patterns, design feasibility, cost effectiveness, and related variables."  *Id.*

(emphasis added).  As the *Freeman* court explained:

> Traffic engineering, design, and highway safety are specialized disciplines, in
> which practitioners use empirical tools to make informed decisions as to what

---

[5] For example, Tyree's expert report notes that the 2011 Pedestrian Road Safety Audit
recommended installing advance pedestrian/bicyclist warning signs for Crosswalk #1.  *Id.* at 7.
The Audit appears to have stated that this measure was recommended because "the RSA team
observed drivers seemingly accelerating once they exited the bridge which only served to create
a hazardous situation at this location" and there was a "[l]ack of sufficient space for perception
and reaction of drivers for pedestrians and bicyclists and vice versa."  *Id.* at 6 (quoting the 2011
Pedestrian Road Safety Audit).  Tyree, though, never measured the speed of traffic coming off
the bridge or otherwise engaged his expertise and experience to verify the audit and back up his
opinion that the recommendations needed to be followed.  *See id.* at 4–10; Def.'s Mot. Attach. 5,
Tyree Dep. 38:20–39:21, 78:17–25, 79:2–20, 85:20–23, 88:9–24.  More to the point, he never
stated, based on his expertise and experience, what the applicable duty of care was, how or why
advance warning signs were required to comply with that duty of care, or whether other
measures, taken individually or in combination, would satisfy the duty of care.

type of traffic control devices will make particular intersections reasonably safe. The layman, although he may cross the street regularly, does not possess the technical knowledge needed to judge the [government's] decision to install a crosswalk, instead of a stop sign, light, or crossing guard, at a particular intersection.

*Id.* at 719 – 20.

Absent expert testimony establishing the duty of care and its scope, the plaintiff is divested of any possibility of proving that the United States—vis-à-vis the National Park Service—committed a breach that subjects it to negligence liability for her injuries.  It is well established that summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, summary judgment will be granted in the United States' favor regarding the negligence elements of duty and breach, which the plaintiff failed to establish.

## II.     Proximate Cause

Even if the plaintiff could prove the duty of care and that the United States breached it, she must also establish that the defendant's negligence proximately caused her injuries. *Freeman*, 477 A.2d at 715.  Under District law, "proximate cause is established when it appears from a preponderance of the evidence that the act or omission played a substantial part in bringing about the injuries or damages" and the "injury or damage was either a direct result or a reasonably probable consequence of the act or omission."  *Id.* (internal formatting omitted). "Proximate cause encompasses both foreseeability of injury and the decision that liability will not attach unless the breach of duty has a substantial and direct causal link to the plaintiff's injury."  *Id.* at 716 (internal citations omitted).  Although the question of whether proximate cause exists is usually a question of fact reserved for a jury, "[t]he question becomes one of law

when the evidence . . . will not support a rational finding of proximate cause," *id.*, as is the case here.

Like the duty-of-care element already discussed, the D.C. Court of Appeals' decision in *Freeman* also forecloses the plaintiff's ability to prevail against the United States on the required element of causation.  This is because the *Freeman* court roundly rejected the notion that a lack of warning signs could be deemed to be the proximate cause of a pedestrian's injuries incurred while crossing a crosswalk when the uncontroverted evidence showed that the motorist who struck the pedestrian was familiar with the general area, knew about the crosswalk's existence, had no obstructed view of the crosswalk, was not otherwise distracted, the day was sunny and dry, and the motorist saw another car stopped at the intersection where the crosswalk was located.  *Id.* at 716.  The D.C. Court of Appeals viewed these facts to sufficiently demonstrate that there was "neither the apparent need for an early warning, nor that the absence of a warning" caused the collision.  *Id.*  Virtually identical undisputed facts are at play in the instant case such that proximate cause remains unproven.

As discussed in the background section of this opinion, there is no dispute that the motorist who struck the plaintiff was generally familiar with the area around Crosswalk #1 and with the existence of the crosswalk given that he had commuted daily along that route for about five years.  Def.'s Mot. Attach. 4, Alberger Dep. 13:15–23, 17:7–23.  There also is no dispute that at least some of the traffic had slowed or come to a complete stop when the plaintiff began to cross Crosswalk #1.  *Id.* Attach. 2, Ellsworth Dep. 10:10–12 (stating that "all the cars were stopped" in "[t]he first two lanes" as the plaintiff began to cross Crosswalk #1), Attach 7, Bertsch Dep. 11:22-24 (affirming that immediately before the collision "traffic had slowed"), Attach. 4, Alberger Dep. 18:18–20.  Although the motorist said that his view of the plaintiff was

obstructed by another vehicle to his left, there is no evidence that his view of Crosswalk #1 was obstructed in such a way that he did not know it was there and, as a matter of fact, he stated that he had stopped at Crosswalk #1 immediately before the collision to let a different bicyclist pass. *Id.* Attach 4, Alberger Dep. 19:14– 20:7.  Finally, it remains undisputed that on the day the plaintiff was struck in Crosswalk #1 "the weather was clear."  *Id.* Attach. 10, Wallace Decl. Ex. A, Report for McCarthy, Winkelman & Mester, L.L.P. at 2 [ECF No. 31-10].

In light of how closely the facts in *Freeman* align with the facts in this case, the Court is compelled to reach the same conclusion that the *Freeman* court reached, which is that the evidence, even when viewed in the light most favorable to the plaintiff, simply cannot support a rational finding of proximate cause as a matter of law.  Like *Freeman*, "[t]he evidence establish[es] neither the apparent need for an early warning, nor that the absence of a warning caused [the motorist] to hit [the plaintiff]."  477 A.2d at 716.  The Court's confidence in this outcome is bolstered by the fact that the plaintiff's expert witness conceded that he could not say "within a reasonable degree of certainty" that the presence of an additional advance warning sign would have changed the behavior of the motorist who struck the plaintiff.  Def.'s Mot. Attach. 5, Tyree Dep. 138:20 – 139:9.  The Court will therefore grant summary judgment in the United States' favor on the issue of proximate causation.

## III.    Contributory Negligence

The United States countered the plaintiff's allegations of negligence with its own contention that the plaintiff committed contributory negligence by (1) failing to dismount from her bike before crossing Crosswalk #1 in violation of a sign that instructed her to do so and (2) failing to look for oncoming traffic while crossing.  Def.'s Reply Mem. in Support of Def.'s Mot. 16 [ECF No. 34].  Although District law provides that "contributory negligence can act as a complete defense to the defendant's liability for negligence," *Jarrett v. Woodward Bros., Inc.*,

751 A.2d 972, 985 (D.C. 2000), the existence of contributory negligence "is usually a question for the jury" and "it is the rare case with evidence so clear and unambiguous that contributory negligence should be found as a matter of law," *Paraskevaides v. Four Seasons Washington*, 292 F.3d 886, 893 (D.C. Cir. 2002) (internal quotation marks omitted).  The Court need not reach this issue in light of its other holdings herein and it is not convinced that evidence of negligence on the plaintiff's part proximately caused her injuries as a matter of law versus remaining a question of disputed facts.

## CONCLUSION

For all the foregoing reasons the Court will grant Defendant's Motion for Summary Judgment [ECF No. 31] and deny Plaintiff's Motion for Partial Summary Judgment [ECF No. 32].  An appropriate order will accompany this opinion.


September 15, 2020                        _____
                                                   Thomas F. Hogan
                                         Senior United States District Judge

-22-